Good morning, Your Honor. I shall talk for five minutes. I shall reserve five minutes for rebuttal. Your Honor, the issue in this case is whether the petitioner is an arriving alien. First of all, Your Honor, I shall refer to the Code of Federal Regulations, that's 8 CFR 245.2A-4-B. That regulation says that the travel outside the United States by an African for an adjustment of status, just like the petitioner here, who is not under exclusion, deportation, or removal proceeding, shall not be deemed an abandonment of the application if he or she was previously granted advance parole for such absences and was inspected and paroled. But the last part of this regulation says that if the adjustment of status of such an individual is subsequently denied, he or she will be treated as an African for admission subject to two provisions, sections 212 and 235 of the Immigration and Nationality Act. Then I move on to the most pivotal regulation in this case, Your Honor. It is 8 CFR section 1.1Q. It defines an arriving alien as thus. The term arriving alien means an African for admission coming or attempting to come into the United States at the port of entry or an alien seeking admission, blah, blah, blah. An arriving alien remains such even if paroled subject to 212 D-5, except that an alien who was paroled before April 1, 1997, Your Honor, shall not be considered an arriving alien for purpose of Immigration and Nationality Act section 235-B. Then, Your Honor, I quickly refer, Your Honor, to the administrative record at page 241. Your Honor, the petition in this case was paroled on November 20, 1995. Clearly, Your Honor, clearly he is exempted to be treated as an arriving alien because he got his parole prior to April 1, 1997. I believe, Your Honor, that that should decide that issue, but I shall move on. There is a second section, which is section 101. That's 8 U.S.C. section 1101A, small a in bracket, 13, then capital A. It defines what an entry is. Your Honor, I believe and I argue today that that section presents the intent of the Congress over and above whatever the regulation is. Your Honor, if it is, if, as I've mentioned now, that the petitioner was not subject to exclusion, and if, as I've argued, that he has already arrived, therefore, the body shifts onto the government, which the court did not know, did not take notice of at the hearing. The body shifted to the government to prove that it was an exclusion hearing and not a, not a deportation hearing. And because it did not discharge the same. I understand this last argument. Are you, in effect, saying that you can't have a parole entry, that any kind of entry necessarily becomes admission under 1101A, 13A? Your Honor, that's a, your Honor, the, in the statute, in the statute, there's no express definition of advanced parole. There's only a definition of parole, and that has been dealt with with the, specifically with the section I had, I mentioned under the regulation. That's ACA file section 1.1Q. Well, you're now referring to the statute, and I thought I understood you say that the statute prevails over the regulation. And I guess I'm not sure exactly what the point is of your argument or your reference to the statute. I'm saying the statute, the statute only, the statute only mentions what consists an entry or an admission. It's mentioned that it must be voluntary, which was voluntary in this case. The statute did not, there's no express section under the statute that dealt with advanced parole. This is the closest. So that's my question. Are you saying that the statute doesn't provide for parole, so the fact that he was let into the country means he necessarily was admitted into the country? Is that your argument? Well, that's not exactly my argument, is that if the Congress had wanted to exclude people who are paroled as not having been admitted, the Congress would have expressly made such law. And because the Congress made an expansive provision under section 1101A.13A, the intent of the Congress could be deciphered from that section. If that's your argument, it leads to a conclusion that says, okay, if that's right, then all they can do at the border is, quote, admit you or turn you away. Now, your client's been admitted, so that might suit your client's purposes, but that suggests that other people coming to the border where the government's not sure whether they should be properly admitted, that it leaves the government no choice but to turn them away. I don't know that that's what Congress intended, whether the statute talks about parole or not. Your Honor, be that as it may, because my time is almost gone, I would like to just rely on the Code of Regulation, which is section 1.1K, which clearly exempts my client because it came before 1997. I shall take other arguments in the border. Okay. Thank you, Your Honor. May it please the Court, my name is Cindy Farrier, and I'll be representing the Attorney General in this matter. This is a case where Petitioner Mr. Malang came. He came, he was admitted as a crewman in transit on a C-1 visa. He overstayed that visa. He applied for and was granted advance parole twice, and prior to the advance parole application, he had falsely filed an application for legalization under 245A. So upon his parole back into the United States, he was allowed in such that that application could be adjudicated. Once that application was adjudicated and was denied, Petitioner then applied for asylum. He was allowed to fully make his asylum request. He was allowed to develop his claim before the immigration judge and the board on appeal, and he had that application denied, but after a full and fair hearing. So the issue here is whether, in fact, he received the due process that he was entitled to with regard to that asylum application. And, in fact, he did. Well, it seems like there are two issues. One refers to the asylum application, like many other cases we have. The other one is one that I used to hear more often, I've heard less often as the years have passed, but it's trying to reach back to the prior scheme, the argument that says this should have been treated as a deportation, not as an exclusion. Right. Or for that matter, I have to admit, I guess there's potentially an argument it should have been a removal if he's arguing that he was admitted, but either way, he's saying it should have been under the old scheme, not the current scheme. Right. Well, this petitioner, it should be quite clear, is, in fact, under the old scheme in the sense that he is in exclusion proceedings. He's not in removal proceedings. Therefore, the arriving alien definition for which he refers to, in fact, wasn't really at play in his case. Rather, in his case, it was simply whether he was a paroled alien, and the parole statute at 1182D5 provides that an alien, in fact, once the parole, the purpose of the parole has been completed, will, in fact, be put into, will, in fact, be in the same place as an applicant for admission. What additional benefits would he get if he were in deportation rather than exclusion? In this case, there would be very little in the sense that he was applying for asylum and he was allowed to make that application and had it adjudicated. So the claims that sometimes that have traditionally come up have been whether there's a certain amount of advance notice of the hearing or of the order show cause and then the hearing. You may be entitled to certain review over certain claims or not. But in this case, he received the review for which he was asking for. So there is no question that he was properly, he was treated as a parolee, and that has been commonly accepted as the right way to be treated. In this court's jurisprudence in Barney and in Navarro-Espera, or which distinguished Navarro-Espera, it was made clear that an alien who had been paroled back in, even though he had an application for adjustment of status pending, would then be subject to exclusion proceedings if that application were denied. And this case is very much like that. He conceded that he had received notice that he could be placed in exclusion proceedings if his application were denied, and that's, in fact, what happened. Sotomayor, turning to his asylum application, it would appear that he was persecuted, but I guess the real issue is was it on the basis of a statutory ground that would allow asylum? Correct. And in this particular case, firstly, he didn't argue to the board anything specific with regard to whether it were on account, was on account of or not. He simply was saying that the MPA was a group that the government was unable or unwilling to control. However, it's clear from the record that, in fact, he didn't make out a claim that his mistreatment was on account of a protected ground. First, he didn't show that there was any imputed political opinion. This Court's case in Borja v. Ashcroft makes clear that there is something such as extortion plus for an alien who had been requested to pay revolutionary taxes to the MPA. But there the Court made clear that the alien had said initially that she did not want to pay those taxes because she supported the government and she did not support the MPA. In our case, the petitioner has only said that he refused to stop bidding on contracts because he wanted to be able to support his family. In his declaration to his asylum application, he states that, I told them that I was just making a living and, therefore, I couldn't do what they wanted me to do because I wouldn't be able to make a living. So it's quite clear that he never made any sort of statement regarding his political opinion. Therefore, none could be imputed to him. Secondly, he hasn't made out a particular social group claim in that he doesn't have the particularity which is required by this Court to establish the social group which he claims to status, the anti-MPA or the anti-rebel. It's simply too vague of terms. Rather, in fact, this case appears to be, as the Board described it, that the MPA simply wanted to get more money from Malang's competitors and they were not seeking to persecute him on any basis of any protected ground. So, therefore, the Board's denial of his asylum claim was, in fact, appropriate. If there are no further questions. If there's not, thank you. Yes, Your Honor. In the authorities filed, subsequent authorities filed by the government in this case, they referred to the case of Ibrahimov against Gonzalez, which is a Second Circuit decision. One of the reasons for which that case was denied was because the petitioner in that case, this was decided on January 25, 2007, less than three years ago. One reason that the case was denied was because the petitioner in that case could not prove that he was in this country prior to July, prior to April 1, 1997. Based on that, the petitioner in this case arrived in this country in 1995, so he benefits under Section 8 CFR Section 1.1Q. Your Honor, I shall move to the asylum claim. The asylum claim is well played in this case, Your Honor. In the administrative record at page 2225 and page 39-41 and page 112-116, there are clear and voluminous accounts of what happened to the petitioner. And at the BIA, at the board of the lower court, the board of immigration appeals, the petitioner argued that he was persecuted by a group which the government of Philippines could not control and could not or was unwilling and unable or unable to control. Okay. So you're, I think, in the government's argument, on whether the persecution was on one of the enumerated grounds. Yes, Your Honor. And if it's not, it doesn't count for our purposes. It is, Your Honor. Your Honor, in this circuit, the law as laid down in the case, in the case of INS against Elias Zacharias, that's a U.S. Supreme Court case, and Sanga, S-A-N-G-H-A, the issue is that the applicant must provide some evidence, direct or circumstantial, that the persecutor was and would be motivated to persecute him because of actual or included status or belief. That is S-A-N-G-H-A at page 1486-87. Your Honor, how can we prove a nexus in this case? It could either be by direct evidence or by circumstantial evidence or by, there are cases of mixed motive. In this case, it could be argued that there was a mixed motive. The MPA told him not to bid for the same contract. The MPA, according to the record, is a terrorist group, not to bid for the same contract as the MPA was bidding, Your Honor. And over from 1986 to up to 2002, the MPA kept on harassing the petitioner, his wife, his children, and even his mother. If, Your Honor, according to the case of Sanga, political opinion could be proved whether by direct affirmative political opinion or. What makes that a political opinion? He does not profess a political opinion. He doesn't claim to be persecuted because of an opinion. He's persecuted, he says, because they don't want his business competition. No. Clear from this case, it is clear that the political opinion is being repeated on him. Because if what he's doing is a variance with what the terrorists were doing, automatically they are clashing. So your argument is because it's the persecution or the abuse is coming from the MPA, that's inherently political because it is a politically terrorist group. Yes, Your Honor. And secondly, we relied on a social group, Your Honor. Our argument is that he belongs to a group of people who are seen as anti-rebel or anti-MPA in Philippines. There are numerous cases. There are cases like Borja, B-O-R-J-A, which is from this circuit as well, in which he was, in which the petitioner was persecuted based on being in opposition with the MPA. Your Honor, a political opinion, according to the next circuit, is that the petitioner must belong to a group, a group with a characteristic whether based on their past experience or activities. In this case, the experience is that he was participating in business with the MPA, a terrorist group was interested. Okay. We thank you. We thank both counsel for the argument. The case just argued is submitted.
judges: B. Fletcher, Clifton, Ikuta